IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| $582,932.89 IN FUNDS SEIZED ON OCTOBER 7, 2021, FROM FARMERS NATIONAL BANK ACCOUNT NO. XXXX9874, PURSUANT TO THE EXECUTION OF A FEDERAL SEIZURE WARRANT, | ) ) ) ) ) ) | |
| | ) | |
| $14,971.75 IN FUNDS SEIZED ON OCTOBER 7, 2021, FROM FARMERS NATIONAL BANK ACCOUNT NO. XXXX9885, PURSUANT TO THE EXECUTION OF A FEDERAL SEIZURE WARRANT, | ) ) ) ) ) ) | |
| | ) | |
| $2,959.22 IN FUNDS SEIZED ON OCTOBER 7, 2021, FROM FARMERS NATIONAL BANK ACCOUNT NO. XXXX0435, PURSUANT TO THE EXECUTION OF A FEDERAL SEIZURE WARRANT, | ) ) ) ) ) ) | |
| | ) | |
| $3,038.96 IN FUNDS SEIZED ON OCTOBER 7, 2021, FROM FARMERS NATIONAL BANK ACCOUNT NO. XXXX8486, PURSUANT TO THE EXECUTION OF A FEDERAL SEIZURE WARRANT[1], | ) ) ) ) ) ) | COMPLAINT IN FORFEITURE |
| | ) | |
| Defendants. | ) | |

---

[1] In addition to the above four (4) bank accounts, $0.07 in funds were seized on October 7, 2021, from Farmers National Bank Account No. XXXX1904, pursuant to the execution of a federal seizure warrant; however, these funds are not named as a defendant property.

NOW COMES plaintiff, the United States of America, by its attorneys, Bridget M. Brennan, United States Attorney for the Northern District of Ohio, Henry F. DeBaggis and James L. Morford, Assistant United States Attorneys, and files this Complaint in Forfeiture, respectfully alleging on information and belief, as follows, in accordance with Supplemental Rule G (2) of the Federal Rules of Civil Procedure:

## JURISDICTION AND INTRODUCTION

1.      This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. Section 1345, and over an action for forfeiture under 28 U.S.C. Section 1355(a).  This Court also has jurisdiction over this particular action under 18 U.S.C. Section 981(a)(1)(C) (civil forfeiture authority – federal health care offenses).

2.      This Court has *in rem* jurisdiction over the defendant properties pursuant to: (i) 28 U.S.C. Section 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in this district; and, (ii) 28 U.S.C. Section 1355(b)(1)(B), incorporating 28 U.S.C. Section 1395, because the action accrued in this district.

3.      The defendant properties are now in the custody of the United States Marshals Service (USMS).  This Court will have control over the defendant properties through service of arrest warrant(s) *in rem*, which the USMS will execute upon the defendant properties.  *See*, Supplemental Rules G(3)(b) and G(3)(c).

4.      Venue is proper in this district pursuant to: (i) 28 U.S.C. Section 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in this district; and, (ii) 28 U.S.C. Section 1395 because the action accrued in this district.

5.      The defendant properties are subject to forfeiture to the United States under 18 U.S.C. Section 981(a)(1)(C) in that they constitute – or are derived from – proceeds traceable to violation(s) of 18 U.S.C. Section 1035 (false statements relating to health care matters), 18 U.S.C. Section 1347 (health care fraud), and 18 U.S.C. Section 1349 (conspiracy to commit health care fraud).

## DESCRIPTION OF THE DEFENDANT PROPERTIES

6.      The following properties are the defendant properties in the instant case:

*Farmers National Bank Business Green Checking Account No. XXXX9874 (Subject Account 1/Defendant Property $582,932.89)*

In or around March 2019, Sebastian Rucci opened a checking account at Farmers National Bank in the name of California Palms Addiction Recovery Campus Inc. ending in x9874.  As of December 3, 2019, Sebastian Rucci and M.N. were the authorized signors on the account.  Between December 2019 and October 2021, approximately $5,941,096.73 of Medicaid program funds were deposited into Subject Account 1, which consisted primarily of the following:

- From October 2019 through October 2021, Subject Account 1 received approximately $2,025,975.03 in **Medicaid funds** through electronic payments and checks from Cenpatico.

- From October 2019 through October 2021, Subject Account 1 received approximately $1,883,116.85 in **Medicaid funds** through electronic payments and checks from United Behavioral.

- From October 2019 through October 2021, Subject Account 1 received approximately $1,581,432.40 in **Medicaid funds** through electronic payments and checks from Molina.

- From October 2019 through March 2021, Subject Account 1 received approximately $229,340.10 in **Medicaid funds** through electronic payments and checks from Paramount.

- From November 2020 through May 2021, Subject Account 1 received approximately $92,800.00 in **Medicaid funds** through electronic payments from Optum VA.

- From March 2020 through October 2021, Subject Account 1 received approximately $92,557.41 in **Medicaid funds** through electronic payments from State of Ohio.

- From September 2020 through August 2021, Subject Account 1 received approximately $18,630.84 in **Medicaid funds** through electronic payments from United Healthcare Community.

- From January 2021 through May 2021, Subject Account 1 received approximately $12,468.20 in **Medicaid funds** through checks from TriCare.

- In June 2020, Subject Account 1 received approximately $4,775.90 in **Medicaid funds** through electronic payments from Aetna.

***Farmers National Bank Business Green Checking Account No. XXXX9885 (Subject Account 2/Defendant Property $14,971.75)***

On March 21, 2019, Sebastian Rucci opened a checking account at Farmers National Bank in the name of California Palms Addition Recovery Campus LLC ending in x9885. Sebastian Rucci and M.N. were the signors on the account. Between April 2019 and October

2021, approximately $2,913,626.55 in funds were deposited into Subject Account 2, which consisted primarily of the following.

- From April 2019 through September 2021, Subject Account 2 received approximately $2,855,932.00 via electronic transfer from Subject Account 1.

- In November 2019, Subject Account 2 received approximately $21,797.10 in **Medicaid funds** via check from Cenpatico.

- In January 2021, Subject Account 2 received approximately $20,732.04 in **Medicaid funds** via check from United Healthcare Community.

- In July 2020, Subject Account 2 received approximately $10,000.00 via check from Sebastian Rucci.

- In January 2021, Subject Account 2 received approximately $5,165.11 via check from Ohio Bureau of Workers' Compensation.

### *Farmers National Bank Business Green Checking Account No. XXXX0435 (Subject Account 3/Defendant Property $2,959.22)*

On June 12, 2020 Sebastian Rucci opened a checking account at Farmers National Bank in the name of California Palms Addiction Recovery Campus Inc. Sebastian Rucci is the signor on the account. Between June 2020 and October 2021, approximately $244,050.00 was deposited into Subject Account 3, which consisted primarily of the following:

- From June 2020 and October 2021, Subject Account 3 received approximately $228,000.00 in transfers from Subject Account 1.

- On May 3, 2021, Subject Account 3 received approximately $13,050.00 via 3 electronic transfers from Subject Account 4.

- On August 20, 2021, Subject Account 3 received approximately $3,000.00 via 1

electronic transfer from Subject Account 2.

***Farmers National Bank Totally Green Checking Account No. XXXX8486 (Subject Account 4/ Defendant Property $3,038.96)***

On March 21, 2019 Sebastian Rucci opened a checking account at Farmers National Bank in the name of Sebastian Rucci ending in x8486. Sebastian Rucci is the signor on the account. Between March 2019 and October 2021, approximately $488,562.45 was deposited into Subject Account 4, with relevant transactions consisting primarily of the following:

- From August 2019 through October 2021, Subject Account 4 received approximately $159,600.00 via transfers from Subject Account 1.

- From September 2019 through August 2021, Subject Account 4 received approximately $7,000.00 via transfers from Subject Account 2.

- In March 2021, Subject Account 4 received approximately $6,045.00 via 2 electronic transfers from Subject Account 3.

### SUMMARY OF ALLEGATIONS AND FORFEITURE
### CALIFORNIA PALMS ADDICTION RECOVERY CAMPUS, INC.

7. California Palms Addiction Recovery Campus, Inc. (California Palms) was incorporated in the State of Ohio as a domestic for-profit corporation on March 2, 2017, and Sebastian Rucci was listed as the statutory agent. In addition, on February 8, 2018, Articles of Organization for California Palms Limited Liability Company (LLC) as a domestic for-profit company were filed and Sebastian Rucci was listed as the statutory agent.

8. California Palms was a Medicaid provider and its representative signed a provider agreement with the Medicaid program which resulted in California Palms being assigned Medicaid provider number 0342236 and a National Provider Number (NPI) 1467993782.

9.     On December 26, 2018, Ohio Mental Health Addiction Services (OHMAS) provided an Interim Certification Certificate to California Palms Addiction and Recovery Campus, Inc. for service of residential, withdrawal management and inpatient Substance Use Disorder (SUD) offering 150 adult residential beds and 50 withdrawal management beds.  The enrollment application for OMHAS indicated the following select Management Care Plans: Aetna Better Health of Ohio, Buckeye Community Health Plan, Caresource, Molina Healthcare of Ohio, Paramount Advantage and United Healthcare Plan of Ohio with Sebastian Rucci listed as the contact (with his contact information) on the application.  On April 4, 2019, Rucci accepted the terms and conditions of the Medicaid provider agreement by electronically signing the agreement and agreeing to its terms.

10.     After signing the Medicaid provider agreement, Sebastian Rucci and others, known and unknown, executed a scheme to defraud Medicaid by billing for services not provided, in violation of 18 U.S.C. § 1347 (Health Care Fraud), which prohibits knowingly and willfully executing and attempting to execute, a scheme to defraud Medicaid, and obtaining by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the care, custody and control of Medicaid, in connection with the delivery and payment for health care benefits and services.

11.     After signing the Medicaid provider agreement, California Palms fraudulently submitted billings to Medicaid in which it up-coded American Society of Addiction Medicine (ASAM) assessments to maximize Medicaid reimbursement; billed Medicaid patients for services that extended beyond the limited thirty (30) day stay; billed urine screens not rendered; utilized individuals without proper credentialing to sign off on patient assessments despite not seeing the patient; and billing Medicaid patients in exchange for free housing.

12.     California Palms and Sebastian Rucci submitted or caused to be submitted false and fraudulent claims to the Medicare Program.

## HEALTH CARE BENEFIT PROGRAMS

13.     The term "health care benefit program," as defined in 18 U.S.C. § 24, means any "public or private plan or contract, affecting commerce, under which any medical benefit, item or service" was provided to any individual, and includes any individual or entity who provides a medical benefit, item or service for which payment may be made under the plan or contract.

14.     The Centers for Medicare and Medicaid Services (CMS) is the agency responsible for the administration of the Medicare and Medicaid program.

15.     Medicaid is a federal health care benefit program, as defined in 18 U.S.C. designated to provide medical services, equipment and supplies to certain individuals and families with low income as outlined in the Social Security Act (42 U.S.C. § 1396, *et seq*.). The federal government funds approximately 60% of Ohio's Medicaid program, and the State of Ohio funds the remainder. The Ohio Department of Medicaid ("ODM") administers the Medicaid program in Ohio. Medicaid provides reimbursement to medical providers who are issued a Medicaid provider number for services rendered to Medicaid recipients under Ohio's Medical Assistance Program. Individuals who receive Medicaid are commonly referred to as "recipients" or "beneficiaries."

16.     Ohio Medicaid providers may only bill Medicaid for services that are medically necessary, and for services actually provided. Medicaid providers agree to know and follow Medicaid reimbursement policies, which are communicated via regulations, manuals and newsletters, and are available on the ODM website.

## AMERICAN SOCIETY OF ADDICTION MEDICINE CRITERIA

17.     The American Society of Addiction Medicine (ASAM) describes treatment as a continuum marked by four broad levels of service and an early intervention level. Within the broad levels of care, decimal numbers are used to further express gradations of intensity of services. The levels of care provide a standard nomenclature for describing the continuum of recovery-oriented addiction services. With the ASAM continuum, clinicians are able to conduct a multidimensional assessment that explores individual risks and needs, as well as strengths, skills and resources. The ASAM continuum provides clinicians with a recommended ASAM Level of Care that matches intensity of treatment services to identified patient needs.

18.     California Palms assessed patients with the following ASAM Levels of Care:

a.      Level 2 encompasses services that are capable of meeting the complex needs of people with addiction and co-occurring conditions. It is an organized outpatient service that delivers treatment services during the day, before or after work or school, in the evening, and/or on weekends.

b.      2.1 - Intensive Outpatient Services for adolescents and adults, this level of care typically consists of 9 or more hours of service a week or 6 or more hours for adults and adolescents respectively to treat multidimensional instability.

c.      2.5 - Partial Hospitalization Services for adolescents and adults.  This level of care typically provides 20 or more hours of service a week, usually during the day as day treatment or partial hospitalization services, for multidimensional instability that does not require 24-hour care.

d.      Level 3 encompasses residential services that are described as co-occurring capable, co-occurring enhanced, and complexity capable services, which are staffed by

designated addiction treatment, mental health, and general medical personnel who provide a range of services in a 24-hour living support setting.

e.      3.1 - Clinically Managed Low-Intensity Residential Services.  This adolescent and adult level of care typically provides a 24-hour living support and structure with available trained personnel and offers at least 5 hours of clinical service a week.

f.      3.5 - Clinically Managed Medium-Intensity Residential Services for adolescents and Clinically Managed High-Intensity Residential Services for adults.  This level of care provides 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Patients in this level are able to tolerate and use full active milieu or therapeutic communities.

g.      3.7 - Medically Monitored High-Intensity Inpatient Services for adolescents and Medically Monitored Intensive Inpatient Services Withdrawal Management for adults.  This level of care provides 24-hour nursing care with a physician's availability for significant problems in Dimensions 1, 2, or 3. Patients in this level of care require medication and have a recent history of withdrawal management at a less intensive level of care, marked by past and current inability to complete withdrawal management and enter into continuing addiction treatment. This is the appropriate setting for patients with subacute biomedical and emotional, behavioral, or cognitive problems that are so severe that they require inpatient treatment.

h.      4.0 - Medically Managed Intensive Inpatient Services for adolescents and adults, this level of care offers 24-hour nursing care and daily physician care for severe, unstable problems in ASAM Dimensions 1, 2 or 3. Counseling is available 16 hours a day to engage patients in treatment.

## CONTROLLED SUBSTANCES

19.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensation of controlled substances in the United States. The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedules I, II, III, IV, and V, as designated by Title 21, United States Code, and Section 802(6) and the Code of Federal Regulations.

20.     A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances. With limited exceptions for medical professionals, the CSA makes it "unlawful for any person knowingly or intentionally" to "distribute or dispense a controlled substance" or conspire to do so. For prescribers, compliance with the terms of their registration means that they cannot issue a prescription unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

21.     A doctor violates the CSA and Code of Federal Regulations if he or she prescribes a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose.  Such a prescription is "not a prescription within the meaning and intent of the CSA," and such knowing and intentional violations subject the doctor to criminal liability under Section 841(a) of Title 21, United States Code.  21 C.F.R. §1306.04(a). The Sixth Circuit, along with other courts, has held that it is unlawful for a practitioner to distribute a Schedule II through V controlled substance if the doctor or pharmacist is not acting within the usual course of professional practice in violation of U.S.C. § 841. United States v. Johnson, 71 F.3d 539, 542-43 (6th Cir. 1995).

22.     The CSA's scheduling of controlled substances is based on their potential for abuse, among other considerations.  The term "Schedule II" means the drug or other substance has a high potential for abuse and includes drugs currently accepted medical use.  Drugs in this category may lead to severe psychological or physical dependence.

23.     Drugs that have a potential for abuse and could lead to moderate or low physical dependence or high psychological dependence are classified as Schedule III drugs.

24.     Drugs that could lead to more limited physical or psychological dependence relative to the drugs in Schedule III are classified as Schedule IV drugs.

25.     Schedule V drugs have a low potential for abuse relative to the drugs or other substances in Schedule IV. These drugs have an accepted medical use in treatment in the United States. Abuse of these drugs or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule IV.

26.     Methadone is a Schedule II controlled substance that is a synthetic opioid that can be prescribed for pain reduction or for use in medication-assisted treatment (MAT) for opioid use disorder (OUD). For MAT, methadone is used under the direct supervision of a healthcare provider.

27.     Schedule III drugs have a potential for abuse less than substances in Schedules I or II and abuse may lead to moderate or low physical dependence or high psychological dependence.  Examples of Schedule III narcotics include: products containing not more than 90 milligrams of codeine per dosage unit (Tylenol with Codeine), and buprenorphine (Suboxone).

28.     To ensure that they are issuing prescriptions for a legitimate medical purpose in the usual course of their professional practice, physicians often test the urine of patients to whom they prescribe opioids. These tests monitor for the presence of other controlled substances that

could negatively interact and lead to the patient's injury or death.  They also test for the presence

of the prescribed drugs themselves in order to rule out that the patients are "diverting" the drugs,

e.g., selling them to drug-addicted users on the street.

## MEDICAID CLAIMS DATA

29.     A review of the California Palms' professional pay to provider Medicaid data for

the time period August 19, 2019, to August 8, 2021, determined, the following:

a.   California Palms filed approximately 34,325 claims, billing $8,220,034.96 and

receiving $4,878,607.39.

b.   The top procedure code billed by California Palms providers and paid to California

Palms was H2036 – ALC &/or Other Drug Treatment Program Per Diem at 13,053 claims.

c.   California Palms billed for services provided to approximately 361 Medicaid

recipients during that time period.

d.   Of the 361 Medicaid patients billed by California Palms, 335 were billed H2036 at

least one time.  This translated to approximately 92% of California Palms' patient population

being evaluated and assessed at ASAM LOC 3.5.

## MEDICAL BILLING AND CODING

30.     Current Procedural Terminology ("CPT") codes are numbers assigned to every

task and service a medical practitioner may provide to a patient.  CPT codes serve both tracking

and billing purposes.

31.     Medical providers record diagnoses and medical procedures on a standard claim

form known in the industry as the CMS 1500 form, which is sent to the beneficiary's health care

benefit program.  The health care provider must designate the CPT codes on the CMS 1500

claim form and then submit the form either by mail or electronically to the health care benefit

program for payment. By submitting claims using these CPT codes, providers represent to Medicaid that the services depicted in the codes were, in fact, performed or provided.

32.     Medicaid assigns each beneficiary a unique health insurance billing number to identify the beneficiary for billing purposes. Once enrolled in Medicaid, a beneficiary may receive covered medical services from Medicaid providers.

33.     From August 19, 2019 through August 08, 2021, California Palms primarily billed for the following CPT codes:

a.     Approximately 13,053 claims for service coded H2036, Alcohol and or other drug treatment program per diem, billing $4,731,284.28 and receiving $2,431,264.90.

b.     Approximately 5,910 claims for service coded H2034, Alcohol and or drug abuse halfway house service per diem, billing $1,317,880.28 and receiving $845,573.25.

c.     Approximately 6,376 claims for service coded H0015, Alcohol/drug service, intensive out-patient program, billing $1,129,486.63 and receiving $777,446.51.

d.     Approximately 3,089 claims for service coded H0005, Alcohol/drug services, group counsel by clinician, billing $117,325.11 and receiving $109,003.06.

34.     From in and around August 2019, through in and around October 2021, California Palms submitted billings to Medicaid in which it up-coded American Society of Addiction Medicine (ASAM) assessments to maximize Medicaid reimbursement. Upcoding occurs when a healthcare provider submits codes to Medicaid for more serious and more expensive diagnoses or procedures than the provider diagnosed or performed. The ASAM level of care placement is based on information collected during the assessment, which was often not completed until after the patients were already admitted to California Palms or prior to the initiation of other services. The levels of care provide a standard nomenclature for describing the continuum of recovery-

oriented addiction services. Patients who were assessed at 3.5 ASAM Level of Care, Clinically Managed High-Intensity Residential Services, which provided 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment, were often working outside of the California Palms facility or were used as laborers at California Palms. Assessments were conducted without establishing a treatment plan to address mental health or substance abuse disorder and/or presenting problems were not included in patient assessments. Assessments of patients in which a 3.5 level of care was not supported were inflated to justify a 3.5 level of care to maximize higher billings. Patients at California Palms received minimal treatment services as a 3.5 level of care which did not support the justification of high intensity services.

35. From in and around August 2019, through in and around October 2021, Chemical Dependency Counselor Assistants (CDCA) at California Palms conducted assessments for patients despite not being authorized to complete assessments. Additionally, the eligible supervisor for a CDCA was often another CDCA which was not permitted. CDCAs at California Palms were permitted to work independently and without appropriate supervision. For example, a CDCA reported supervision was inconsistent or often nonexistent During an OHMAS survey on November 6, 2019, California Palms failed to provide supervisory contracts and supervision records for CDCA staff.

36. Throughout the investigation, current and former patients were interviewed and investigators learned California Palms billed for services not rendered from in and around August 2019, through in and around October 2021. As an Ohio Medicaid provider, California Palms was permitted to only bill Medicaid for services that were medically necessary, and for services that were actually provided. California Palms caused CMS 1500 forms to be submitted

to Medicaid to generate billing. These forms included CPT codes, claiming services were performed or provided. False or misleading documentation was submitted to Medicaid including, but not limited to: Patient progress notes were cut and pasted; progress notes included inconsistent and conflicting information, such as a patient being treated for opioid dependence instead of alcohol dependence; patients were discharged yet California Palms continued to bill for services; and patient records indicated a status of homeless despite arriving from a sober living/recovery housing prior to their admission at California Palms. Whether an individual is homeless is an influencing factor in a high-risk rating and could result in the inappropriate placement at a residential ASAM level of care.

37.    Investigators determined that from in and around August 2019, through in and around October 2021, California Palms billed for services using National Provider Identification (NPI) of licensed individuals in order to be paid at a higher rate despite those licensed individuals not providing services. NPIs were used without the knowledge or consent of the provider. California Palms used Best Notes, an Electronic Medical Records (EMR) software program to document patient history and care provided. California Palms did not have safeguards in place to ensure the authenticity of signatures on clinical documents within the EMR. As a result, electronic signatures of clinicians, who were no longer employed by California Palms were forged.

38.    The Ohio Department of Mental Health and Addiction Services entered an Adjudication Order effective October 28, 2021, *In the Matter of California Palms Addiction Recovery Campus*, Docket No. MHAS-2006, in which the provider certification for California Palms Addiction Recovery Campus was revoked.

39.     By letter dated November 17, 2021, the Ohio Department of Medicaid notified

Sebastian Rucci, Owner, California Palms Addiction Recovery Campus, Inc. that its provider

agreements with the Ohio Department of Medicaid were terminated effective October 29, 2021,

and that Ohio law affords no appeal of this action.


**CONCLUSION**

40.     By reason of the foregoing, the defendant properties [namely, $582,932.89 seized

from account XXXX9874, $14,971.75 seized from account XXXX9885, $2,959.22 seized from

account XXXX0435 and $3,038.96 seized from account XXXX8486] are subject to forfeiture to

the United States under 18 U.S.C. Section 981(a)(1)(C) in that they constitute – or are derived

from – proceeds traceable to violation(s) of 18 U.S.C. Section 1035 (false statements relating to

health care matters), 18 U.S.C. Section 1347 (health care fraud), and 18 U.S.C. Section 1349

(conspiracy to commit health care fraud).

WHEREFORE, plaintiff, the United States of America, requests that the Court enter judgment condemning the defendant properties and forfeiting them to the United States, and providing that the defendant properties be delivered into the custody of the United States for disposition according to law, and for such other relief as this Court may deem proper.

Respectfully submitted,

Bridget M. Brennan
United States Attorney, N.D. Ohio

By:

Henry F. DeBaggis (OH: 0007561)
James L. Morford (OH: 0005657)
Assistant United States Attorneys
Carl B. Stokes U.S. Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio  44113
216.622.3749 / Henry.DeBaggis@usdoj.gov
216.622.3743 / James.Morford@usdoj.gov

**VERIFICATION**

STATE OF OHIO       )
                         ) SS.
COUNTY OF CUYAHOGA  )

      I, Henry F. DeBaggis, under penalty of perjury, depose and say that I am an Assistant

United States Attorney for the Northern District of Ohio, and the attorney for the plaintiff in the

within entitled action.  The foregoing Complaint in Forfeiture is based upon information

officially provided to me and, to my knowledge and belief, is true and correct.

 

                                                     Henry F. DeBaggis (OH: 0007561)
                                                     Assistant United States Attorney

 

Sworn to and subscribed in my presence this 11th day of January 2022.

                                       Notary Public

EDWARD F. FEIGL, Attorney
NOTARY PUBLIC – STATE OF OHIO
My commission has no expiration date.
Section §47.03 R.C.